UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSHUA NICHOLAS HEARNS,

     Applicant,

v.                               CASE NO. 8:21-cv-163-SDM-TGW

SECRETARY, Department of Corrections,

     Respondent.

_____/

## ORDER

     Hearns applies under 28 U.S.C. § 2254 for a writ of habeas corpus (Docs. 1) and challenges his conviction for conspiracy to traffic oxycodone, for which Hearns is imprisoned for twenty-five years.  Numerous exhibits support the response. (Doc. 5-2)  The respondent admits that the application is timely (Doc. 5 at 7–8) but asserts that some grounds are procedurally barred.  (Doc. 5 at 13–14, 17–18, 28–29)

## I. BACKGROUND[1]

     An information charged Hearns with conspiracy to traffic oxycodone, five counts of trafficking oxycodone, and five counts of obtaining a controlled substance by fraud.  (Doc. 5-2 at 29–33)  James Kipp, a co-defendant who pleaded guilty, testified that Hearns recruited him to obtain oxycodone pills.  (Doc. 5-2 at 107) Hearns drove Kipp both to a residence where a person wrote Kipp a prescription for

---

[1] This summary of the facts derives from the trial transcripts.

oxycodone and to a pharmacy where Kipp filled the prescription. (Doc. 5-2 at 107–08) Hearns kept two-hundred of the thirty-gram oxycodone pills and gave Kipp forty pills. (Doc. 5-2 at 109)

Also, Hearns asked Kipp to recruit others to obtain oxycodone. (Doc. 5-2 at 109) Kipp drove John Weiss and Jeffrey Gradert to the residence where Hearns wrote a prescription for each and gave each money to fill the prescription at the pharmacy. (Doc. 5-2 at 111–14) Hearns kept two hundred pills from each prescription, gave Kipp twenty pills from each prescription, and gave Weiss and Gradert each twenty pills. (Doc. 5-2 at 109, 115) Kipp recruited Lori Moser who obtained a prescription from Hearns and filled the prescription, and Hearns gave Kipp twenty pills. (Doc. 5-2 at 121–22) Kipp recruited Brenda Weiss and Jason Mathis who obtained prescriptions from Hearns and filled the prescriptions, but Hearns did not give Kipp pills from those prescriptions. (Doc. 5-2 at 116–17, 121, 123) John Weiss, Brenda Weiss, Moser, Gradert, and Mathis admitted that they received pills after filling the prescriptions written by Hearns. (Doc. 5-2 at 224–34, 245–58, 277–88, 303–12, 327–37)[2]

A records custodian for the pharmacy testified that John Weiss received 180 pills of thirty-milligram oxycodone, Brenda Weiss received 240 pills, Moser received 240 pills, Mathis received 240 pills, and Gradert received 180 pills. (Doc. 5-2 at 169–70, 172–73, 174–75, 176–78) The pharmacy's records showed that

---

[2] Mathis did not observe Hearns write the prescription but testified that he gave his identification to a person at the residence and observed Hearns give the person a prescription. (Doc. 5-2 at 330–31)

Dr. Rothenberg prescribed the pills, and a pharmacy technician testified that she likely verified with Dr. Rothenberg's office the authenticity of the prescriptions. (Doc. 5-2 at 186–87, 217)  The pharmacy routinely verified the authenticity of a prescription for a new customer from Dr. Rothenberg's office, and John Weiss, Brenda Weiss, Moser, Mathis, and Gradert were new customers.  (Doc. 5-2 at 186–87)

In his own defense Hearns testified that he knew Kipp for about a year and both John and Brenda Weiss lived with Kipp.  (Doc. 5-2 at 472–73, 475–76)  Hearns claimed that he was Dr. Rothenberg's patient and denied either meeting Gradert, Moser, and Mathis or writing a prescription for oxycodone.  (Doc. 5-2 at 474–78) The jury found Hearns guilty of conspiracy to traffic oxycodone but acquitted him of all other counts.  (Doc. 5-2 at 721–31)

## II.  EXHAUSTION AND PROCEDURAL DEFAULT

The respondent argues that ground one, ground two, and two sub-claims in ground three are procedurally barred from federal review because Hearns failed to exhaust the claims.  (Doc. 5 at 13–14, 17–18, 28–29)  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby

alerting that court to the federal nature of the claim." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (citing *Henry*, 513 U.S. at 365–66).

**Ground One:**

Hearns asserts that trial counsel's representation of Hearns's uncle, Herbert Battle, Jr., created an actual conflict of interest that adversely affected trial counsel's performance in Hearn's case.  (Doc. 1 at 16–19)  Hearns alleges that he told trial counsel that he wanted to cooperate with law enforcement against Battle, a drug trafficker, in an effort to secure a waiver of the twenty-five-year mandatory minimum sentence that he faced.  (Doc. 1 at 17)  He alleges that trial counsel forbade him to cooperate against Battle.  (Doc. 1 at 17)   Hearns asserts that, but for trial counsel's conflict of interest, he would have cooperated against Battle, obtained a waiver of the mandatory minimum sentence, and pleaded guilty.  (Doc. 1 at 17–18) ("Sub-claim A")

Also, Hearns alleges that trial counsel continued to represent him after his trial and until May 16, 2016, when the state appellate court granted trial counsel's motion to withdraw.  (Doc. 1 at 18)  Hearns alleges that in 2015 an information charged trial counsel with driving under the influence.  (Doc. 1 at 18)  He contends that trial counsel recruited Battle to traffic heroin and attempted to cooperate with law enforcement against Battle to obtain mitigation in his criminal case and in proceedings before The Florida Bar.  (Doc. 1 at 18)  He contends that an indictment charged trial counsel and Battle with conspiracy to possess with intent to distribute heroin, and both pleaded guilty.  (Doc. 1 at 18–19)  *See United States v. Burch*,

No. 8:16-cr-465-SCB-SPF (M.D. Fla.). Hearns asserts that trial counsel deficiently performed and represented him with a conflict of interest on direct appeal by not pursuing cooperation with law enforcement against Battle on Hearn's behalf and instead pursuing cooperation on trial counsel's own behalf. (Doc. 1 at 19) ("Sub-claim B")

Hearns failed to raise sub-claim A in his motion for post-conviction relief (Doc. 5-2 at 1020–68) and in his brief on appeal. (Doc. 5-2 at 1598–1642) Also, he failed to raise sub-claim B in his petition alleging ineffective assistance of appellate counsel. (Doc. 5-2 at 915–44) If Hearns returned to state court to raise the sub-claims, the post-conviction court would deny both sub-claims as procedurally defaulted. Fla. R. Crim. P. 3.850(b) and (h). Fla. R. App. P. 9.141(d)(5) and (d)(6)(C). Consequently, the sub-claims are procedurally defaulted in federal court. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief.").

The sub-claims are barred from federal review absent a showing of either "actual cause and prejudice" or a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Hearns asserts that, under *Martinez v. Ryan*, 566 U.S. 1 (2012), the absence of post-conviction counsel serves as cause to excuse the procedural default. (Doc. 1 at 5) "To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is

a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14.

**Sub-claim A:**

Hearns asserts that trial counsel deficiently performed before trial by representing him with a conflict of interest. (Doc. 1 at 16–18) *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022), narrowed relief under *Martinez* by prohibiting a federal court from considering evidence not presented to the post-conviction court unless the applicant meets his burden under Section 2254(e)(2):

> Often, a prisoner with a defaulted claim will ask a federal habeas court not only to consider his claim but also to permit him to introduce new evidence to support it. Under the Antiterrorism and Effective Death Penalty Act of 1996, the standard to expand the state-court record is a stringent one. If a prisoner has "failed to develop the factual basis of a claim in State court proceedings," a federal court "shall not hold an evidentiary hearing on the claim" unless the prisoner satisfies one of two narrow exceptions, *see* 28 U.S.C. § 2254(e)(2)(A), and demonstrates that the new evidence will establish his innocence "by clear and convincing evidence," § 2254(e)(2)(B). In all but these extraordinary cases, AEDPA "bars evidentiary hearings in federal habeas proceedings initiated by state prisoners." *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013).

> The question presented is whether the equitable rule announced in *Martinez* permits a federal court to dispense with § 2254(e)(2)'s narrow limits because a prisoner's state postconviction counsel negligently failed to develop the state-court record. We conclude that it does not.

Section 2254(e)(2) bars a federal court from holding an evidentiary hearing unless an applicant carries a heavy burden:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that —

> (A) the claim relies on —
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Hearns's application fails to demonstrate that he meets the burden under Section 2254(e)(2).  (Doc. 1 at 16–19)  Because "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel," *Shinn*, 596 U.S. at 382, and the post-conviction record fails to demonstrate that trial counsel represented Hearns with a conflict of interest (Doc. 5-2 at 1019–1582), Hearns fails to demonstrate prejudice under *Martinez*.

**Sub-claim B:**

Hearns asserts that trial counsel deficiently performed by representing him with a conflict of interest on direct appeal.  (Doc. 1 at 18–19)  Because *Martinez* applies only to an ineffective assistance of trial counsel claim, *Martinez* provides no relief for sub-claim B.  *Davila v. Davis*, 582 U.S. 521, 529 (2017) ("Petitioner asks us to extend *Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state

postconviction counsel provides ineffective assistance by failing to raise that claim. We decline to do so.").  Even if *Martinez* applies, Hearns's application fails to demonstrate that he meets his burden under Section 2254(e)(2) (Doc. 1 at 16–19), and the post-conviction record fails to demonstrate that trial counsel represented Hearns with a conflict of interest on direct appeal.  (Doc. 5-2 at 1019–1582)

Because Hearns fails to demonstrate prejudice under *Martinez*, sub-claim A and sub-claim B are procedurally barred from federal review.

**Ground Two:**

Hearns asserts that trial counsel deficiently performed by failing to advise Hearns that the prosecutor's plea offer of fifteen years in prison was not a mandatory minimum sentence ("sub-claim A") and by failing to explain the strengths and weaknesses of the prosecutor's case ("sub-claim B").  (Doc. 1 at 19)

Hearns failed to raise the sub-claims in his motion for post-conviction relief (Doc. 5-2 at 1020–68) and in his brief on appeal.  (Doc. 5-2 at 1598–1642)  If Hearns returned to state court to raise the sub-claims, the post-conviction court would deny both sub-claims as procedurally defaulted.  Fla. R. Crim. P. 3.850(b), (h). Consequently, the sub-claims are procedurally defaulted in federal court.  *Snowden*, 135 F.3d at 736.  Because the application fails to demonstrate that Hearns meets his burden under Section 2254(e)(2) (Doc. 1 at 19–20), and the post-conviction court record does not contain statements between Hearns and trial counsel that demonstrate that trial counsel deficiently advised Hearns (Doc. 5-2 at 1019–1582),

Hearns fails to demonstrate prejudice under *Martinez*.  Consequently, sub-claim A and sub-claim B are procedurally barred from federal review.

**Ground Three:**

Hearns asserts that trial counsel deficiently performed by not presenting at trial testimony by a handwriting expert ("sub-claim A") and testimony by a nurse ("sub-claim B"), by not deposing the prosecutor's witnesses to prepare for cross-examination ("sub-claim C"), and by not reviewing with Hearns the discovery and the terms of the plea offer, by not preparing Hearns to testify at trial, and by not preparing a defense ("sub-claim D").  (Doc. 1 at 20–21)

Hearns failed to raise sub-claim C and sub-claim D in his motion for post-conviction relief (Doc. 5-2 at 1020–68) and in his brief on appeal.  (Doc. 5-2 at 1598–1642)  If Hearns returned to state court to raise the sub-claims, the post-conviction court would deny both sub-claims as procedurally defaulted. Fla. R. Crim. P. 3.850(b), (h).  Consequently, the sub-claims are procedurally defaulted in federal court.  *Snowden*, 135 F.3d at 736.  Because the application fails to demonstrate that Hearns meets his burden under Section 2254(e)(2) (Doc. 1 at 20–21), and the post-conviction court record fails to demonstrate that trial counsel deficiently performed in the manner that Hearns contends (Doc. 5-2 at 1019–1582), Hearns fails to demonstrate prejudice under *Martinez*.  Consequently, sub-claim C and sub-claim D are procedurally barred from federal review.

### III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 governs this proceeding.  *Wilcox v. Fla. Dep't Corrs.*, 158 F.3d 1209, 1210 (11th Cir. 1998).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. . . . Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 694. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim issues an explanatory and reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188,

1192 (2018).  When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning."  *Wilson*, 138 S. Ct. at 1192.  A respondent may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ."  *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court affirmed the denial of Hearns's Rule 3.850 motion for post-conviction relief.  *Hearns v. State*, 297 So. 3d 538 (Fla. 2d DCA 2020).  A state appellate court's *per curiam* decision without a written opinion warrants deference under Section 2254(d)(1).  *Wright v. Sec'y, Dep't Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002).  *Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record

> in existence at that same time, *i.e.*, the record before the state
> court.

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Hearns bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001). The state court's rejection of Hearns's claims warrants deference in this federal action. (Doc. 5-2 at 1199–1221, 1458–64)

## IV. ISSUES ON POST-CONVICTION

### Ground Four:

Hearns asserts that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to the defense exculpatory evidence that proved that Hearns did not write the prescriptions for oxycodone ("sub-claim A") and violated *Giglio v. United States*, 405 U.S. 150 (1972), by presenting false testimony by John Weiss ("sub-claim B") and Detective Speth ("sub-claim C"). (Doc. 1 at 21)

### Sub-claim A

Hearns asserts that the prosecutor violated *Brady* by failing to disclose to the defense exculpatory evidence that proved that Hearns did not write the prescriptions for oxycodone. (Doc. 1 at 21) The post-conviction court denied the claim as follows (Doc. 5-2 at 1200–01) (state court record citations and bolding omitted):

> Defendant alleges that the judgment against him violated his
> due process rights, specifically in violation of *Brady v. Maryland*,
> 373 U.S. 83 (1962), which held that "the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* [at] 1196–97. Defendant asserts that all of the State co-conspirator witnesses who testified that Defendant had written the prescriptions that were the subject of this case

> had a probable cause affidavit written in reference to their original arrest. These documents which are sworn to by [a] law enforcement officer contain a paragraph which states:

> 'In March 2012 Sarasota County Sheriff's Office Pharmaceutical Diversion Unit received information indicating that multiple individuals from south Sarasota County area were passing fraudulent prescriptions from Luxor Industries Physicians Group of North Fort Myers [1890 N. Tamiami Trail, Unit F, North Fort Myers at Apple Pharmacy located at North Indiana Avenue in Englewood] between June and August, 2011. The fraudulent prescriptions were written for thirty milligram (240 count) and fifteen milligram (90 count). The prescriptions were allegedly handwritten and signed by Dr. Lawrence Rothenberg. Information from multiple sources corroborated these facts.'

Defendant asserts that the "multiple sources" referenced in the probable cause affidavits in question

> '[who] had given favorable information to law enforcement officers would have negated defendant's guilt to the crime,' and that 'the information received from these sources was ironically consistent with the State's witness Pharmacy Tech Ms. Malazio's testimony that the prescriptions were verified by the doctor office and consistent with the defendant's trial testimony that he never wrote any prescriptions. This information furthermore contradicted the State's six co-conspirator witnesses' trial testimony that the defendant had written the prescriptions.'

> Pursuant to *Brady*, a due process violation occurs when a prosecutor "withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty . . . ." *Id.* In the instant case, Defendant alleges that the information he seeks would have been exculpatory; this claim is inherently incredible. If Defendant had demanded the identities of the unnamed "multiple sources," such identities would not have been exculpatory. Defendant ignores the fact that in the probable cause affidavits, the statement written is that the prescriptions were allegedly handwritten and signed by Dr. Lawrence Rothenberg — that is what the "multiple sources" corroborated, not that Dr. Rothenberg actually did handwrite and sign the prescriptions. More importantly, however, is another paragraph present in each probable cause affidavit, in which the officer noted that the very same Dr. Rothenberg "reviewed the prescriptions collected" and "signed an affidavit which stated that he did not authorize the prescription issued . . . ." Defendant cannot demonstrate, therefore, that having the identities of the "multiple sources" would have been exculpatory, and therefore cannot demonstrate a *Brady* violation.

"To establish a *Brady* violation, a defendant must prove three essential elements:  (1) that the evidence was favorable to the defendant, either because it is exculpatory or impeaching; (2) that the prosecution suppressed the evidence, either willfully or inadvertently; and (3) that the suppression of the evidence resulted in prejudice to the defendant." *Rimmer v. Sec'y, Fla. Dep't Corrs.*, 876 F.3d 1039, 1054 (11th Cir. 2017).  "To establish prejudice, the defendant must show that the suppressed evidence was material, [or] a reasonable probability that, had the suppressed evidence been disclosed, the result of the proceeding would have been different." *Rimmer*, 876 F.3d at 1054.

The probable cause affidavit supporting Moser's arrest states that "[t]he prescriptions were allegedly handwritten and signed by Dr. Lawrence Rothenberg,"

and "[i]nfomation from multiple sources corroborated these facts." (Doc. 5-2 at 1148)  The affidavits supporting the arrest of the other cooperating witnesses contain identical language. (Doc. 5-2 at 1153, 1159, 1168, 1174)  Because the affidavits demonstrate that "multiple sources" reported that Dr. Rothenberg "allegedly" handwrote and signed the prescriptions, and Hearns fails to submit evidence that demonstrates that the "multiple sources" would state that Dr. Rothenberg actually handwrote and signed the prescriptions, the claim fails. *Wright v. Sec'y, Fla. Dep't Corrs.*, 761 F.3d 1256, 1281 (11th Cir. 2014) ("[A] *Brady* claim fails when it is only speculative that the materials at issue would have led to exculpatory information.").

Also, the affidavit supporting Moser's arrest states (Doc. 5-2 at 1148):

> On July 12, 2012, Dr. Rothenberg reviewed the prescriptions collected from Apple Pharmacy. Dr. Rothenberg signed an affidavit which stated that he did not authorize the prescription issued in [Lori Moser's] name. . . .

The affidavits supporting the arrest of the other cooperating witnesses contain identical language. (Doc. 5-2 at 1153, 1159, 1168, 1174)  Even if "multiple sources" reported that Dr. Rothenberg actually handwrote and signed the prescriptions, Dr. Rothenberg's testimony would rebut the allegations, and Hearns cannot demonstrate "a reasonable probability that, had the suppressed evidence been disclosed, the result of the proceeding would have been different." *Rimmer*, 876 F.3d at 1054.  Consequently, the post-conviction court did not unreasonably deny the claim.  Sub-claim A is denied.

**Sub-claim B**

Hearns asserts that the prosecutor violated *Giglio* by presenting testimony by John Weiss.  (Doc. 1 at 21)  Hearns contends that John Weiss falsely testified that "[John Weiss] did not receive a benefit for his testimony" and about "the circumstances of his probation."  (Doc. 1 at 21)  The post-conviction court denied the claim as follows (Doc. 5-2 at 1201–03) (state court record citations omitted):

> Defendant asserts that during his trial, the "co-conspirator John Weiss testified falsely" that he was not compelled to testify at the trial. Defendant specifically claims that because Mr. Weiss had been "granted immunity to give a proffer at which time he [implicated] the defendant," and as a result "was given a favorable treatment in exchange for his testimony," then Mr. Weiss's testimony that he was testifying of his own free will was false. Defendant's claim, therefore, is that the State knew that Mr. Weiss was not there of his own free will, rendering this testimony false, and because that "false testimony allowed the jury to believe that he had not received any benefit or proffered treatment in exchange for [his] testimony," this is a *Giglio* violation and therefore Defendant should be granted a new trial.
>
> Because Mr. Weiss's purportedly false testimony was known to Defendant at the time of trial, this issue could have been raised on direct appeal. Such procedurally defaulted claims have been treated as barred on post-conviction review. *See Moore v. State*, 132 So. 3d 718, 724 (Fla. 2013); *Owen v. State*, 986 So. 2d 534, 549 (Fla. 2008); *Jimenez v. State*, 997 So. 2d 1056, 1070 (Fla. 2008); Fla. R. Crim. P. 3.850(c). Some courts, however, have cautioned against summarily precluding a *Giglio* claim, even though it could have been raised at an earlier time. *See, e.g.*, *Johnson v. State*, 128 So. 3d 155, 156–57 (Fla. 2d DCA 2013); *Robinson v. State*, 65 So. 3d 75, 76 (Fla. 2d DCA 2011). Therefore, the Court will examine Defendant's claim.
>
> *Giglio* stands for the proposition that a prosecutor "has a duty to correct testimony he or she knows is false when a witness conceals bias against the defendant through that false testimony." *Ventura v. State*, 794 So. 2d 553, 562 (Fla. 2001) (quoting *Routly v. State*, 590 So. 2d 397, 400 (Fla. 1991)) (internal quotations omitted). "The thrust of *Giglio* and its

progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and the prosecutor not fraudulently conceal such facts from the jury." *Robinson v. State*, 707 So. 2d 688, 693 (Fla. 1998) (quoting *Routly*, 590 So. 2d at 400). In order to establish a *Giglio* violation, a defendant must show that (1) a witness presented false testimony; (2) the prosecutor knew the testimony was false; and (3) the statement was material. *Guzman v. State*, 868 So. 2d 498, 505 (Fla. 2003); *Robinson v. State*, 65 So. 3d 75, 76 (Fla. 2d DCA 2011). A statement is "material" if "there is a reasonable probability that the false testimony could have affected the judgment of the jury." *Guzman*, 868 So. 2d at 506 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Defendant's claim fails because it does not demonstrate that Mr. Weiss gave false testimony. While it may be true that Mr. Weiss made his original proffer in exchange for a negotiated plea, it is also true that by the time Mr. Weiss testified at trial, he had already served his entire sentence of county jail time and probation. Thus, even though Mr. Weiss's sentence contained the Court's directive to testify truthfully, double jeopardy had already attached — if Mr. Weiss did not testify consistently with his proffer, the State did not have the option of prosecuting him for the original crime charged. Therefore, the Court cannot find that Mr. Weiss was not testifying of his own free will, and as such, the State could not have committed a *Giglio* violation in this regard. Furthermore, Defendant appears to be attacking the credibility of this witness, and "matters which go only to the credibility of a particular witness will not suffice" for post-conviction relief. *DeHaven v. State*, 618 So. 2d 337, 339 (Fla. 2d DCA 1993). Finally, "the fact the testimony was perjured must have been unknown to the defendant at the time of the trial and not ascertainable through diligent investigation and preparation." *Id.* Clearly, Defendant was well aware of the negotiated plea at the time of trial. Indeed, at trial, Mr. Weiss was asked by the State how many felony convictions he had and whether those convictions were related to the testimony he was to give at trial, giving the jury the opportunity to judge for itself Mr. Weiss's credibility in this regard.

"'[I]n order to prevail on a *Giglio* claim, a petitioner must establish [1] that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and [2] that the falsehood was material.'"

*Raleigh v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 938, 949 (11th Cir. 2016) (quoting *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1277 (11th Cir. 2005)).  "A falsehood is material if there is 'any reasonable likelihood' that it could have affected the result."  *Raleigh*, 827 F.3d at 949 (quoting *Ventura*, 419 F.3d at 1278).

At trial John Weiss testified that neither the prosecutor nor a condition of his probationary sentence compelled his testimony (Doc. 5-2 at 222):

| [Prosecutor:] | Mr. Weiss, do you know why you are here today? |
|---|---|
| [Weiss:] | I do. |
| [Prosecutor:] | Okay. Are you a convicted felon? |
| [Weiss:] | I am. |
| [Prosecutor:] | Okay. How many felony convictions do you have? |
| [Weiss:] | Two. |
| [Prosecutor:] | Are those felony convictions related to your testimony here today? |
| [Weiss:] | They are. |
| [Prosecutor:] | Are you on probation? |
| [Weiss:] | No. |
| [Prosecutor:] | Are you being forced to testify here today? |
| [Weiss:] | I was subpoenaed, but no, I'm not being forced. |
| [Prosecutor:] | If you did not testify or did not testify to the prosecutor's liking, would that impact you in any way? |
| [Weiss:] | No, not that I know of. |

| [Prosecutor:] | So you are here of your own free will other than that subpoena that you spoke about? |
|---|---|
| [Weiss:] | Yeah, other than the subpoena. |

During closing trial counsel objected to the prosecutor's argument that neither the prosecutor nor a condition of John Weiss's probationary sentence compelled him to truthfully testify (Doc. 5-2 at 603–08):

| [Prosecutor #1:] | Let's talk about pressure or threats being used against the witnesses. And these are all the items that you're going to look at when you're evaluating what you remember about their testimony. Jason Mathis did not want to be here. He made that very clear. He would not have been here had it not been for his probation agreement, but he was here. |
|---|---|
| | John. Let's talk about John. John is the only one of this bunch that's not on probation. His testimony was not required, not a condition of his release, nothing was promised to him. He showed up of his own will. |
| [Trial counsel:] | Objection, Your Honor, may we approach? |
| [Court:] | You may. |

(The following proceedings ensued at the bench.)

| [Trial counsel:] | Judge, I believe that's a misstatement of fact, because John is not on probation. It was an understanding that as part of his plea that he would testify. So, the State could always revoke his plea. So, to say that he received nothing, he's here on his own free will is a misstatement. |
|---|---|
| [Court:] | Okay. I don't know if it was part of the plea. Is that accurate? |

| | |
|---|---|
| [Prosecutor #1:] | I don't know, Your Honor. As far as it being a part of this plea, he's off probation. He's completed his probation. They can't revoke a plea at that point. He said that he was here because of the subpoena, but he's not here because he was required to testify and that was the testimon[ial] evidence. |
| [Prosecutor #2:] | It was part of his plea he should have had to, but his probation ended. |
| [Prosecutor #1:] | Your Honor, as co-counsel has stated, it was part of his plea to testify during probation, but his probation has ended. If he chose not to testify, he may have had an issue with the subpoena, but he would not have had an issue with probation nor could the State have revoked his plea after his sentence had been completed. |
| [Court:] | So, he had already completed his sentence at the time this case came to trial? |
| [Prosecutor #1:] | Yes, Your Honor. |
| [Trial counsel:] | Judge, I specifically remember the plea offers that were offered in this case and part of their plea offer — as a matter of fact, I gave the State a copy of the plea form and I'm pretty sure the plea form says that they are required to testify and they are specifically agreeing that if they do not testify, as a condition of their plea, their plea agreement can be withdrawn. |
| [Court:] | I'm at a disadvantage because that didn't come out in evidence and I don't have that in front of me. |
| [Prosecutor #1:] | Your Honor, I'm arguing what was stated in evidence and the testimony provided by the witnesses. Mr. Weiss testified that he did not have to be here. |
| [Court:] | Okay. I think that's really all you can do. That was actually stated in the trial and if |

it wasn't brought out that that was incorrect in the testimony, then I think it is appropriate argument to be made. So I'm going to overrule the objection.

[Trial counsel:] Judge, the State can't make an argument they know is legally and factually inaccurate. Whether it came out in testimony or not, they are the ones that forbade —

[Court:] But I would think they wouldn't make an argument that is contrary to what was a factual agreement. They're saying it isn't. They're saying that he only had to testify during the time he was on probation. I don't know. I wasn't —

[Trial counsel:] Judge, I would certainly [point] out —

[Prosecutor #1:] If I may?

[Trial counsel:] — if he specifically agrees, you absolutely cannot have it done before.

[Court:] Yes, I would agree that a lot of deals are made that you go back to square one and you could even face the original charges that you were facing.

[Prosecutor #2:] While they're on probation, Your Honor.

[Prosecutor #1:] I will stick with what was said in evidence. That's what my statement will be.

[Court:] Okay. I think that if there is any issue at all [whether] it is accurate, you should simply stay away from it, but I will agree that you are entitled to argue what was stated in the courtroom.

[Prosecutor #1:] Thank you.

[Trial counsel:] Judge, before we leave this, it is my full intention to get a copy of the plea agreement. If the plea agreement says

otherwise, other than what she's arguing, then she is knowingly misrepresenting — her co-counsel is knowingly allowing her to misrepresent the factual truthfulness of his plea offer. And I think Mr. Pica knows exactly what the conditions of that plea agreement were because I looked at another plea agreement from another defendant and that was a condition.

[Prosecutor #2:]    It's in discovery. I can probably hand it to you right now. Would you like to see it?

[Court:]    I would prefer that you simply stay away from the area if it's at issue. I'll leave it up to you.

[Prosecutor #2:]    It's only his issue.

[Prosecutor #1:]    I'll move on.

[Court:]    It could be yours if he is accurate that you are intentionally misrepresenting what actually happened. I don't know. I don't have it in front of me.

[Prosecutor #2:]    Would you like me to grab the plea?

[Court:]    If you'd like.

[Prosecutor #2:]    This is it.

[Trial counsel:]    It doesn't say anything about probation. It says "testify truthfully."

[Prosecutor #2:]    That's the entire language.

[Court:]    Well, it doesn't say while on probation. I understand what you're saying. I would have to read the colloquy. It really depends on the colloquy and what was said with regard to his failure to testify truthfully and what the ramifications would be. That's generally handled in the colloquy. I don't know the answer to that.

[Prosecutor #1:]    Your Honor, if I may?

| | |
|---|---|
| [Court:] | Okay. |
| [Prosecutor #1:] | There's nothing in that statement that indicates that the State has the ability to revoke his plea agreement had he not shown up to testify. The State does not possess the ability to vacate a plea agreement for any such reason. Reasons are specifically set out by statute and by rule. This plea agreement does not provide a provision to do that. It is totally proper for the State to argue the evidence that was introduced in this court. If defense counsel believed something else was different, he had an opportunity to impeach the witness at that time and could have done so. |
| [Court:] | Okay. Well, as I say, I can only go by what did happen here in the trial and I don't have the colloquy in front of me, so I will overrule the objection. |

Rule 3.170(g), Florida Rules of Criminal Procedure, authorizes a prosecutor to move to vacate a plea if a defendant fails to substantially comply with a term of the agreement.  John Weiss's plea agreement required that he "testify truthfully [in accordance with] his previous proffer."  (Doc. 5-2 at 1193)  However, John Weiss testified that he completed his probationary sentence (Doc. 5-2 at 222), and if a defendant completes his sentence, the trial court lacks subject matter jurisdiction to grant a Rule 3.190(g) motion and vacate an expired sentence.  *McClintock v. State*, 995 So. 2d 1147, 1148 (Fla. 5th DCA 2008) ("[O]nce an individual has served his or her complete sentence, the trial court loses jurisdiction to enter any further orders in the matter."); *Maybin v. State*, 884 So. 2d 1174, 1175 (Fla. 2d DCA 2004) ("Once a sentence has already been served, even if it is an illegal sentence or an invalid

sentence, the trial court loses jurisdiction and violates the Double Jeopardy Clause by reasserting jurisdiction and resentencing the defendant to an increased sentence."). Consequently, John Weiss did not falsely testify that he did not face any consequence if the prosecutor determined that his testimony was unsatisfactory. *Maharaj v. Sec'y, Dep't Corrs.*, 432 F.3d 1292, 1313 (11th Cir. 2005) ("In the *Giglio* context, the suggestion that a statement may have been false is simply insufficient; the defendant must conclusively show that the statement was actually false.").

Also, "*Giglio* error is a species of *Brady* error that occurs when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'" *Ventura*, 419 F.3d at 1276–77 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Because the record demonstrates the prosecutor disclosed John Weiss's plea agreement before trial (Doc. 5-2 at 606), and John Weiss testified at trial that he completed his probationary sentence (Doc. 5-2 at 222), the post-conviction court did not unreasonably deny the *Giglio* claim. Sub-claim B is denied. *See Grayson v. King*, 460 F.3d 1328, 1337 (11th Cir. 2006) ("*Brady* concerned the suppression of evidence prior to and during trial that was material to the proceedings and denied the defendant a fair trial. Here, Grayson makes no argument that the biological evidence was suppressed at trial, denying him a fair trial; rather, it was presented at trial, and it is beyond peradventure that Grayson received a fair trial.").

**Sub-claim C**

Hearns asserts that the prosecutor violated *Giglio* by presenting false testimony by Detective Speth. (Doc. 1 at 21) He contends that Detective Speth falsely testified that the lineup presented to Brenda Weiss contained six photographs and that he presented a lineup to Jason Mathis. (Doc. 1 at 21)

**Brenda Weiss**

Hearns asserts that the prosecutor violated *Giglio* by presenting false testimony by Detective Speth. (Doc. 1 at 21) He contends that the lineup presented to Brenda Weiss contained only two photographs and that Detective Speth falsely testified that the lineup contained six photographs. (Doc. 1 at 21) The post-conviction court denied the claim as follows (Doc. 5-2 at 1204–05) (state court record citations omitted):

> Defendant asserts that a detective who testified gave "false testimony as to his issuance of a six-picture photo pack to co-conspirator Brenda Weiss and the facts surround[ing] the identification of Defendant." Defendant specifically claims that

> > Detective Speth basically testified that State's Exhibit 8 was the photo array he issued to Brenda Weiss. This photo array contained a six-picture photo pack. This photo array is the same photo array located in the discovery. This photo array has a cover page. Although this cover [and] instruction page does have Detective Speth as the administ[rator] of the photo array, this instruction page purports Ms. Weiss's photo array that Detective Speth administered on June 5, 2013, only contained a two-picture photo pack. Therefore, State's Exhibit 8, the six-picture photo pack, was not the photo pack that Detective Speth administered to Brenda Weiss on June 5, 2013. Furthermore, the origins of State's Exhibit 8 were unknown as it is clearly not the

photo pack [that] the cover [and] instruction page [were] referring to. Based on these facts stipulated above Detective Speth's trial testimony regarding Ms. Weiss's pre-trial out-of-court photo array was false for the following reason. Detective Speth administered a two-picture photo array instead of a six-picture photo array.

It appears that Defendant is claiming that because the cover sheet that accompanies the "six-pack" of photos to which Detective Speth testified shows "two" in the blank space on the cover sheet, Detective Speth necessarily testified falsely about the photo pack that was presented to Brenda Weiss. Defendant asserts that such testimony "affected jury judgment" because "the case might have been decided on false testimony and misleading evidence presented. This photo array was critical as co-defendant [and] co-conspirator James Kipp stated he did not accompany co-conspirator Brenda Weiss, therefore she was the only individual who could identify the defendant as the supplier and writer of the fraudulent prescription on that day." Defendant claims that Detective Speth's purported false testimony "prevented the jury from knowing that co-conspirator Brenda Weiss was shown a two-picture photo pack which amounted to a suggestive lineup," and that this "false testimony prevented the jury from knowing the circumstances that the defendant was identified in a two-picture photo pack with a fifty-percent chance of error [. . .] and allowed the jury to believe she was shown a six-picture photo pack."

First, Defendant's assertion that a "two-pack" with a "fifty percent chance of error" was somehow more damaging than a "six-pack," which would have come with an even greater chance of error, defies logic. More importantly, Defendant[ ] claim[s] that because the cover sheet appears to show that it was a "two-pack" rather than a "six-pack," Detective Speth's testimony is necessarily false. This assertion is completely speculative. There could be any number of reasons why the number "two" is written in the cover sheet, not the least of which is that Ms. Weiss selected photo number two as "Big Mike." Finally, Defendant fails to mention in this [claim] that four other witnesses were presented with photo arrays, and all [four] of these witnesses identified Defendant from their respective photo arrays. In light of all of the above, Defendant does not demonstrate that Detective Speth's testimony is false and cannot, therefore, demonstrate a *Giglio* violation by the State. [The claim], therefore, is denied.

At trial Detective Speth testified that he presented a photographic lineup to Brenda Weiss, and the trial court admitted into evidence as State's Exhibit 8 the photographic lineup that the detective showed Brenda Weiss (Doc. 5-2 at 403–04):

| | |
|---|---|
| [Prosecutor:] | We talked about Mrs. Brenda Weiss. |
| [Detective:] | Yes. |
| [Prosecutor:] | We did not talk about her photo lineup identification. |
| [Detective:] | Correct. |
| [Prosecutor:] | Did you administer a photo lineup to her? |
| [Detective:] | Yes. |
| [Prosecutor:] | Where did this occur? |
| [Detective:] | During the proffer. |
| [Prosecutor:] | During the proffer. So, the circumstances surrounding her photo lineup were different than the others? |
| [Detective:] | Yes. |
| [Prosecutor:] | Were there any promises that were made to her? |
| [Detective:] | No. |
| [Prosecutor:] | Did she receive prosecutorial immunity for her statement that day? |
| [Detective:] | Yes. |
| [Prosecutor:] | Your Honor, permission to approach. |
| [Court:] | You may. |
| [Prosecutor:] | I'm showing you State's 8 in evidence. If you will take a look at that. Is that the |

|                  | photo lineup you administered to Ms. Weiss? |
|------------------|---------------------------------------------|
| [Detective:]     | It is.                                      |
| [Prosecutor:]    | Did you threaten her, tell her she had to pick somebody, coerce her? |
| [Detective:]     | No.                                         |
| [Prosecutor:]    | Did she pick somebody?                      |
| [Detective:]     | She did.                                    |
| [Prosecutor:]    | Permission to publish.                      |
| [Court:]         | You may.                                    |

A form that Brenda Weiss signed after the detective showed her the photographic lineup states (Doc. 5-2 at 1163):

> Complete AFTER the photo array: The photo array I was shown consisted of _2_ photos.
>
> Choose:
> ( ) I am unable to select any photo as being the person who _____.
>
> (X) I have selected #_2_ as the person who _____"Big Mike"_____.

Brenda Weiss handwrote the number "2" and "Big Mike" on the form. (Doc. 5-2 at 1163) Attached to the form are six photographs on a single page, and Brenda Weiss circled and initialed the second photograph and wrote the date. (Doc. 5-2 at 1163) Also, at trial, Brenda Weiss identified State's Exhibit 8 as the lineup that the detective showed her and confirmed that she identified Hearns in the lineup. (Doc. 5-2 at 257–58) Consequently, the post-conviction court did not unreasonably determine that Brenda Weiss mistakenly wrote on the form that the detective showed

her two photographs.  Because the detective did not falsely testify, the *Giglio* claim
fails.  *Maharaj*, 432 F.3d at 1313.

Also, John Weiss, Lori Moser, Jeffrey Gradert, and Jason Mathis, the other
cooperating witnesses, identified Hearns in a photographic lineup.  (Doc. 5-2 at
232–33, 286–87, 310–11, 336–37)  Detective Speth confirmed that he showed the
lineup to each witness.  (Doc. 5-2 at 397–403)  Even if Detective Speth falsely
testified about the lineup that he presented to Brenda Weiss, four additional
cooperating witnesses identified Hearns, and Hearns cannot demonstrate "'any
reasonable likelihood' that [the false testimony] could have affected the result."
*Raleigh*, 827 F.3d at 949.  Consequently, the post-conviction court did not
unreasonably deny the claim.

**Jason Mathis**

Hearns asserts that the prosecutor violated *Giglio* by presenting false testimony
by Detective Speth who testified that he presented to Mathis a photographic lineup.
(Doc. 1 at 21)  He contends that a different detective presented the lineup.  (Doc. 1
at 21)  The post-conviction court denied the claim as follows (Doc. 5-2 at 1205–06)
(state court record citations omitted):

> Defendant once again asserts that Detective Speth gave false
> testimony, and that the State was aware of it. In this ground,
> Defendant asserts that the following testimony was false:
>
> [Prosecutor:]     Did you administer Mr. Mathis a photo
>                   lineup?
>
> [Detective:]      I did. Again, that's at the initial interview
>                   which was done in his house.

[Prosecutor:]      I'm approaching with what's been marked Exhibit 20 in evidence. The same question for Mr. Mathis's lineup. Did you suggest to him a picture on that page?

[Detective:]      No.

[Prosecutor:]      Did you tell him he had to circle somebody?

[Detective:]      No.

[Prosecutor:]      Thank you. And is this [the] line up that you administered to Mr. Mathis[?]

[Detective:]      It is.

Defendant asserts that State's Exhibit 20, which was shown to Detective Speth during his above testimony, was "not the eyewitness out-of-court photo array Detective Speth administered to Mr. Mathis." Defendant's specific claim is that Exhibit 20 is a photo array with an instruction sheet, and that instruction sheet appears to indicate that the photo array was administered by Detective Miguel Torres on June 24, 2014, and not by Detective Speth in his October 23, 2012, interview with Mr. Mathis. Thus, claims Defendant, the testimony of Detective Speth — that Exhibit 20 was the photo array he presented to Mr. Mathis — is false testimony, the State knew it was false because Exhibit 20 was part of the State's discovery provided to Defendant, and therefore the State committed a *Giglio* violation. However, Mr. Mathis himself testified at trial that he identified Defendant in the photo lineup introduced as State's Exhibit 20. Furthermore, Detective Speth testified that he spoke with Mr. Mathis twice, first in Mr. Mathis's home and again while Mr. Mathis was in custody. As a result, Defendant cannot demonstrate prejudice, and therefore, [the claim] is denied.

Attached to Hearns's motion for post-conviction relief are a photographic lineup and a form both signed by Mathis and Detective Miguel Torres and dated June 24, 2014.  (Doc. 5-2 at 1155)  The prosecutor introduced into evidence, as State's Exhibit 20, a second lineup and a second form both signed by Mathis and Detective Speth and dated September 6, 2012.  (Doc. 5-2 at 536–37)  At trial Mathis

testified that, on September 6, 2012, he identified Hearns in the photographic lineup admitted into evidence as State's Exhibit 20 (Doc. 5-2 at 336–37, 350), and Detective Speth testified that he showed to Mathis that lineup.  (Doc. 5-2 at 399–400)  Because Detective Speth did not falsely testify, the post-conviction court did not unreasonably deny the claim.  *Maharaj*, 432 F.3d at 1313.  Sub-claim C and ground four are denied.

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

Hearns claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*,
>
> > First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Hearns must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To meet this burden, Hearns must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

Hearns cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the

extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.  Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Richter*, 562 U.S. at 105.

In denying Hearns's Rule 3.850 motion for post-conviction relief, the state court recognized that *Strickland* governs a claim of ineffective assistance of counsel. (Doc. 5-2 at 1207–08, 1459)  Because the state court rejected the grounds based on *Strickland*, Hearns cannot meet the "contrary to" test in Section 2254(d)(1).  Hearns instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.  In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable.  *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001).  The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

## A.  Grounds of IAC Before and During Trial

## Ground Three:

Hearns asserts that trial counsel deficiently performed by not presenting testimony by a handwriting expert ("sub-claim A") and testimony by a nurse ("sub-claim B").

**Sub-claim A:**

Hearns asserts that trial counsel deficiently performed by not presenting testimony by a handwriting expert.  (Doc. 1 at 20)  Hearns contends that an expert would testify that Hearns did not write the prescriptions for oxycodone.  (Doc. 1 at 20)  The post-conviction court denied the claim as follows (Doc. 5-2 at 1459–61) (state court record citations omitted):

> Defendant alleges that his counsel was ineffective for failing "to obtain an expert in handwriting to analyze the handwriting on the prescriptions prior to trial and testify at trial that the handwriting was not Defendant's." Specifically, Defendant asserts that he
>
>> [A]dvised defense counsel that he had not written any of the prescriptions he was accused of writing. He also asked defense counsel to obtain an expert who could analyze the writing on the prescriptions. Furthermore, there was information received from multiple sources that corroborated that the allegedly fraudulent prescriptions were handwritten and signed by the doctor. There was no audio, video, photographs, or fingerprints available in the instant case. Therefore, counsel's failure to obtain a handwriting expert to analyze the prescriptions and testify at trial that the handwriting [did] not belong[ ] to defendant constitutes ineffective assistance.
>
> Defendant goes on to state that his counsel, during closing arguments, asked the jury to compare the handwriting on the prescriptions, that is, to look at the prescriptions and compare them to each other, and that pursuant to *Redmond v. State*, 731 So. 2d 77 (Fla. 2d DCA 1999), allowing a jury to "assume the role of expert" is impermissible.
>
> In its response, the State argues that the discovery in this case included five prescriptions, which Defendant attached to his motion. The State asserts that the jury, which was shown all of the prescriptions, could clearly see that the prescriptions contained varied styles of handwriting, and did not require an

expert to see this. § 90.702, Fla. Stat. *Johnson v. State*, 314 So. 2d 248, 252 (Fla. 1st DCA 1975). Moreover, the State argues, Defendant's claim that a handwriting expert would have testified that the handwriting did not belong to Defendant is entirely speculative; such an expert might also have found that Defendant did write the prescriptions.

Given the great differences between the handwriting styles on the prescriptions, the assertion that a handwriting expert would have determined that Defendant did not write those prescriptions is, indeed, speculative. To the extent that Defendant is arguing, pursuant to *Redmond*, that the jury may have "assumed the role of expert," this claim is conclusory. Moreover, an examination of counsel's closing argument shows that, even if counsel was attempting to have the jury "assume the role of expert," he was doing so in a manner which appears to have been favorable to Defendant. Defendant's claim in this regard does not overcome a presumption that such a closing argument could be considered sound trial strategy. *Simmons*, [105 So. 3d at 487]. Finally, six witnesses testified that Defendant wrote the prescriptions. In light of that testimony and the speculative nature of the claim, Defendant cannot demonstrate with any reasonable certainty that hiring a handwriting expert would have changed the outcome of the proceedings. Thus, this ground fails to demonstrate prejudice as required by *Strickland*.

Because Hearns did not support his claim with an affidavit or testimony by a handwriting expert to demonstrate that the expert would testify in the manner that he contended, the post-conviction court did not unreasonably determine that the claim was speculative. *McKiver v. Sec'y, Fla. Dep't Corrs.*, 991 F.3d 1357, 1365 (11th Cir. 2021) ("[T]his [prejudice] burden is particularly 'heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative.'") (quoting *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006)).

Also, during closing, trial counsel argued that the handwriting of the

cooperating witnesses and the handwriting on the prescriptions contained similarities

(Doc. 5-2 at 646–47):

[Trial counsel:]      The other part, which is where I was
going right before break, each one of these
— and you'll only get the opportunity to
look at them — the prescriptions are
written in medical fashion. Now, there's
no evidence presented to you whatsoever
that Mr. Hearns has any special training
and would know how to write these types
of prescriptions. Mr. Wilferth testified that
some of them were written PRN, take as
needed. Ask Mr. Hearns, do you know
what PRN is? He has no idea.
Mr. Hearn's education is — he's a high
school graduate and went to the Culinary
Arts Academy. Didn't graduate from that.
No indication that he would know how to
write prescriptions like these. The only
indication is from those individuals that
he did. But take a look at the
prescriptions. Actually, take a look at the
prescriptions and compare the
handwriting.

Here's John Weiss and here's Brenda
Weiss. Look at the handwriting and see
for yourself if that looks like the same
handwriting. You're able to do that. Look
at all these prescriptions. Because under
the State's theory and the State's
witnesses, Mr. Hearns filled out all these.
So the writing should be consistent. Look
at the T's in Mathis and Gradert. Look at
the A's. Ladies and gentleman, you're the
trier of fact. Examining the evidence is
what you do. Look at it. The State's
theory, the State's evidence, their story, he
wrote all of these. So unless he's a master
manipulator with handwriting and has
specialized medical knowledge to write
prescriptions that would not only fool a
pharmacist, the State's expert, but would

> apparently also fool staff at the doctor's office because of how it's written. That's what you have to believe, to believe that he did it. You have the physical evidence to look at. Ladies and gentleman, it doesn't make sense.

Because Hearns fails to demonstrate that no competent counsel would forgo presenting testimony by a handwriting expert and instead argue in closing similarities between the handwriting of the cooperating witnesses and the handwriting on the prescriptions, his *Strickland* claim fails. *Strickland*, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."); *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").

Lastly, James Kipp, John Weiss, Brenda Weiss, Lori Moser, and Jeffrey Gradert testified that they observed Hearns write the prescriptions. (Doc. 5-2 at 114, 234, 248–49, 252, 281–82, 307) Even if a handwriting expert opined that Hearns's handwriting was inconsistent with the handwriting on the prescriptions, Hearns cannot demonstrate a reasonable probability that the outcome at trial would change. *Strickland*, 466 U.S. at 694; *Sullivan*, 459 F.3d at 1109–11. Consequently, the post-conviction court did not unreasonably deny the claim. Sub-claim A is denied.

**Sub-claim B:**

Hearns asserts trial counsel deficiently performed by not presenting testimony by a nurse who would testify that Dr. Rothenberg prescribed oxycodone to Jeffrey Gradert, one of the cooperating witnesses. (Doc. 1 at 20) The post-conviction court denied the claim as follows (Doc. 5-2 at 1461–62) (state court record citations omitted):

> Defendant alleges that his counsel was ineffective for failing "to call Matthew Flores as an impeachment witness who was an employee at the doctor's office that was willing, ready, and available to testify that co-conspirator Jeffrey Gradert's prescription[ ] Defendant was accused of writing was a legitimate prescription that was verified." Defendant's specific claim is that there was
>
> > a prescription located in the discovery. This document has co-conspirator Jeffery Gradert's name on it with attention Matt written on the bottom of it and a purported fax date of January 26, 2012, which was months before the prescription was discovered to be fraudulent at Apple Pharmacy on June 8, 2012. This indicated that the prescription had quite possibly been verified by some employee at the doctor's office months before it was believed to be fraudulent. The defendant also informed defense counsel that the reference to Matt on the prescription copy was an employee by the name Matthew Flores who was the office manager or nurse at the doctor's office. The defendant knew this information because he was a patient at the doctor's office. However, trial counsel did not attempt to locate or call Matthew Flores as a witness for Defendant. Furthermore, during trial, Pharmacy Technician Michelle Malazio testified that she had faxed the same prescription that Defendant informed defense counsel of prior to trial to an employee by the name of Matt and that the doctor's office did verify that co-conspirator Gradert's prescription was legit[imate].

According to Defendant,

> If Mr. Gradert['s] prescription was legit[imate]
> that means he had indeed traveled to the
> doctor['s] office which was inconsistent with his
> trial testimony that he had not. . . . This would
> have allowed the jury to infer that Mr.
> Gradert['s] prescription was written by the
> doctor, which means the defendant in fact had
> not written Jeffrey Gradert['s] prescription which
> was inconsistent with Mr. Gradert['s] testimony
> that the Defendant did and this would have been
> inconsistent with Mr. Kipp['s] testimony that the
> Defendant wrote Mr. Gradert['s] prescription.
> Also, John Weiss['s] testimony that he was with
> Mr. Kipp and Jeffery Gradert when this
> happened would have been impeached because
> according to Mr. Flores['s] testimony,
> Mr. Gradert['s] prescription was legit[imate] . . . .

Finally, Defendant asserts, he was prejudiced by counsel failing to call Matthew Flores "who was ready, available, and willing to testify to the status of Jeffrey Gradert['s] prescription being legit[imate;] this testimony would've put the State's entire case on the ropes."

The State argues that "Gradert's trial testimony demonstrates that [Defendant's] claim is conclusively refuted by the record," because Mr. Gradert testified that he once had a legal prescription for oxycodone, but that his prescribing physician was in Tampa, not Fort Myers, that he had never obtained any pain pills from Fort Myers, had "never heard of Luxor Industries," and that Dr. Rothenberg, the physician whose name was on the prescriptions, was not his prescribing physician. This argument is not persuasive. Certainly, if Mr. Flores had been called as a witness, he could have testified differently than Mr. Gradert, and the jury would have been in a position to determine the credibility of each witness.

The State is correct, however, that Defendant cannot meet the prejudice prong of *Strickland* in this ground. Even if Mr. Flores had given testimony that successfully contradicted Mr. Gradert's testimony, there remained four other "forged Rothenberg prescriptions" in evidence, as well as the testimony of the other co-conspirators, all of which overwhelmingly supported a finding of guilt on the conspiracy charge.

> Defendant cannot demonstrate, with a reasonable certainty,
> that the outcome of his trial would have been different if
> Mr. Flores had testified, as required by *Strickland*.

Attached to Hearns's motion for post-conviction relief is a prescription for oxycodone dated August 13, 2011, for Jeffrey Gradert.  (Doc. 5-2 at 1169)  At the bottom of the prescription is a handwritten note that states "1/26/12 — Fax — 239-599-8259," the fax number for Dr. Rothenberg's office, and "Att: Matt." (Doc. 5-2 at 1169)  At trial a pharmacy technician testified that she verified Gradert's prescription with a nurse who worked for Dr. Rothenberg (Doc. 5-2 at 177–78):

| | |
|---|---|
| [Prosecutor:] | I'm showing you State's 13. |
| [Technician:] | Okay. |
| [Prosecutor:] | Could you indicate the name of the patient on the prescription? |
| [Technician:] | Jeffrey Gradert. |
| [Prosecutor:] | And what was Mr. Gradert trying to receive? |
| [Technician:] | Oxycodone, thirty milligrams, 180. |
| [Prosecutor:] | Okay. And do you recall Mr. Gradert in particular? |
| [Technician:] | Yes, I do. |
| [Prosecutor:] | And why is that? |
| [Technician:] | He tried to come back the next day and said — he came in, dropped the script and tried to say somebody stole his [identification], his driver's license, and tried to fill a script under his driver's license. And it was him, the same person. Have I checked for you? It's you. You know. |

[Prosecutor:]      And that brings us to Exhibit 14. Were you the person that actually took the prescription from Mr. Gradert?

[Technician:]      Yes, I was.

[Prosecutor:]      What about this particular driver's license with prescription copy would indicate to you that you were the person that took the prescription?

[Technician:]      Two Ps, and I went and faxed the doctor's office and put it to the attention of Matt, who was the nurse at the doctor's office. Wrote to the doctor just to fax over to make sure it was written and it was Jeffrey, you know, which I knew it was.

[Prosecutor:]      So you attempted to verify the prescription.

[Technician:]      Yes, I did verify the prescription. Yes.

[Prosecutor:]      Again, how would you know that this prescription was actually filled?

[Technician:]      How do I know it was filled?

[Prosecutor:]      I'll show you State's Exhibit 15.

[Technician:]      Yeah, that would show me. It was dispensed right here, Jeffrey Gradert on 8/16. It was filled for 180, Mallinckrodt manufacturer.

Hearns asserts that trial counsel deficiently performed for not calling the nurse to testify that the doctor prescribed the oxycodone to Gradert.  (Doc. 1 at 20)  Hearns contends that the nurse's testimony would impeach Gradert, who testified that he did not obtain the prescription from the doctor's office.  (Doc. 1 at 20)  He further asserts that the nurse's testimony would impeach Gradert, James Kipp and John Weiss, who testified that they observed Hearns write the prescription.  (Doc. 1 at 20)

Because the pharmacy technician testified that, before dispensing the oxycodone to Gradert, she confirmed with the nurse that Dr. Rothenberg prescribed the narcotic, the nurse's testimony would duplicate the pharmacy technician's testimony. Consequently, Hearns failed to demonstrate prejudice under *Strickland*. *Reaves v. Sec'y, Fla. Dep't Corrs.*, 872 F.3d 1137, 1157 (11th Cir. 2017) ("We have [ ] held that counsel's failure to present cumulative evidence is not ineffective assistance."). *Holsey v. Warden, Ga. Diag. Prison*, 694 F.3d 1230, 1260–61 (11th Cir. 2012) ("[T]he United States Supreme Court, this Court, and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.").

Also, the jury found Hearns guilty of conspiracy to traffic oxycodone. (Doc. 5-2 at 721)  Even if the jury accepted the nurse's testimony and determined that the doctor lawfully prescribed to Gradert the oxycodone, evidence at trial proved that Hearns unlawfully wrote prescriptions for James Kipp, John Weiss, Brenda Weiss, and Lori Moser.  (Doc. 5-2 at 114, 234, 248–49, 252, 281–82) Consequently, Hearns cannot demonstrate a reasonable probability that the outcome at trial would change.  Sub-claim B and ground three are denied.  *Strickland*, 466 U.S. at 694; *Sullivan*, 459 F.3d at 1110–11.

## VI.  CONCLUSION

Hearns's application for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Hearns and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Hearns fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate either the merits of the grounds or the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Hearns must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on March 21, 2024.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE